**AFFIDAVIT**

I, William Fath, state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since December 2020.  I am currently assigned to the FBI's Boston Field Office.  In May 2021, I graduated from the FBI Academy in Quantico, Virginia, where I received training in investigating federal criminal violations, among other topics.  I have conducted complex white-collar investigations, including those involving wire fraud and other white-collar crimes.  Before becoming an FBI Special Agent, I worked as a performance auditor for the State of Louisiana.

2.      I submit this affidavit in support of an application for a criminal complaint charging RICARDO FONTANILLA ("FONTANILLA") with wire fraud, in violation of 18 U.S.C. § 1343, and for a warrant for FONTANILLA's arrest.

3.      As detailed below, there is probable cause to believe that between at least as early as 2016 and December 2025, FONTANILLA embezzled more than $6.6 million from his Massachusetts employer.

4.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. In submitting this affidavit, I have not included every fact known to me about this investigation. Instead, I have only included facts that I believe are sufficient to establish probable cause for the requested complaint and arrest warrant.

**PROBABLE CAUSE**

5.      At all times relevant to this affidavit:

a. The "Victim Company" was a global financial services firm. The company's U.S. headquarters was located in Massachusetts. Among its business lines, the Victim Company was a Master Servicer and Securities Administrator of residential mortgage-backed security ("RMBS") loan portfolios.[1] As a Master Servicer and Securities Administrator, the Victim Company collected borrowers' mortgage payments from third-party mortgage servicers (such as Company A below) and transferred those payments to the beneficiaries of trusts that had invested in RMBS loan portfolios.

b. FONTANILLA was a citizen of the United States and the Philippines who lived in Fairfax, Virginia. Between 2013 and late 2025, FONTANILLA worked at the Victim Company (and a predecessor company that the Victim Company had acquired) as a Security Administration Services employee. In that role, among other responsibilities, FONTANILLA had access to Company A's financial systems related to the receipt of payments from third-party mortgage servicers and the distribution of payments to the Victim Company's trust clients. In 2025, FONTANILLA was earning approximately $83,000 annually.

c. Company A was a third-party mortgage servicer that contracted with the Victim Company to administer loan portfolios on its behalf. Company A collected monthly payments from borrowers, managed escrow accounts, handled customer service, and sent monthly payments to the Victim Company for mortgages that it serviced.

---

[1] From my training and experience investigating financial matters and my involvement in this investigation, I am aware that residential mortgage-backed securities ("RMBS") are investment instruments representing ownership in a pool of residential mortgage loans. Investors buy RMBS to receive periodic payments of interest and principal generated through borrowers' monthly mortgage payments.

d.      "Reconciliation" was a monthly process in which each of the Victim Company's third-party mortgage servicers, including Company A, reported to the Victim Company activity from all of the loans in each of the servicers' loan pools.  As a Security Administration Services employee, FONTANILLA verified and aggregated this financial data and generated a "reconciliation report".  Following the issuance of a reconciliation report, the third-party mortgage servicers sent funds to the Victim Company, which then remitted funds to the beneficiaries of the trusts corresponding to each pool of loans for which the Victim Company was the Master Servicer and Securities Administrator.

*FONTANILLA's Fraudulent Scheme*

6.      Based on the investigation to date, and as described in substance below, between at least as early as 2016 and in or about late 2025, FONTANILLA devised and executed a scheme and artifice to defraud the Victim Company and to obtain money and property from the Victim Company by means of materially false or fraudulent pretenses, representations, and promises.

7.      First, FONTANILLA used his access to the Victim Company's financial systems to manipulate the reconciliation data that third-party servicers reported, to make it appear that the Victim Company was expecting <u>less</u> money than what the third-party servicers planned to send— effectively creating the appearance of an overpayment by one or more third-party servicers.

8.      Second, FONTANILLA caused the Victim Company to wire those supposed overpayments to Company A—even when Company A was not the purported source of those supposed overpayments.  FONTANILLA nevertheless falsely represented the amounts he wired to Company A to have been legitimately due to Company A.

9.      Third, FONTANILLA contacted Company A representatives and falsely claimed that the Victim Company had overpaid Company A and requested a return of those funds.

10.     Fourth, FONTANILLA directed a Company A employee to wire the supposedly overpaid amounts to a personal Wells Fargo bank that FONTANILLA controlled.

*The January 2024 Reconciliation Fraud*

11.     I have obtained and reviewed records from the Victim Company and other financial institutions regarding one execution of FONTANILLA's fraud scheme as described below.

12.     In January 2024, a third-party mortgage servicer reported that it expected to send the Victim Company approximately $667,642.59 related to a particular pool of loans.

13.     After receiving the third-party mortgage servicer's report, FONTANILLA authored a "Reconciliation/Remittance Report" ("the R/R Report") on one of the Victim Company's financial systems.  FONTANILLA's R/R Report falsely stated that the Victim Company was expecting a remittance of $516,130.59—an amount that was $151,512 less than the amount that the third-party mortgage servicer had reported it expected to send.

14.     FONTANILLA added comments to the January 2024 R/R Report stating, "servic[e]r reporting NIB balance which was paid off on 11/21".[2]  According to Victim Company representatives, the Victim Company does receive occasional NIB payments based on loan modifications, payments deferrals, or other kinds of assistance programs.  The Victim Company, however, had no record of an NIB balance payoff on November 21, 2023—making FONTANILLA's statement in the January 2024 R/R Report false.

---

[2] I am aware based on my conversations with Victim Company officials that "NIB" refers to non-interest-bearing balance, which is a portion of a total principal owed on a loan that does not accrue interest.

15.     On or about January 18, 2024, the third-party mortgage servicer wired $667,642.50 to the Victim Company, consistent with its earlier report of what it expected to wire to the Victim Company.

16.     On or about January 19, 2024, after the Victim Company received the wire, FONTANILLA generated and sent to the third-party mortgage servicer a "Servicer Turnaround – Final Report" ("STFR") reflecting the supposed overpayment.  The STFR was a document that the Victim Company used to reconcile differences in expected and received monthly payments.

17.     On or about January 19, 2024, FONTANILLA made two comments in the Victim Company's financial system regarding the supposed overpayment:  "*Funds received*", which acknowledged the servicer's payment, and "additional funds to be wire[d] back to the servicers", which acknowledged the need to send the supposed overpayment back to the servicer.

18.     On or about January 22 or January 23, 2024, according to Victim Company records, FONTANILLA's user account (fontanillar@americas.[Victim Company].net) requested the transfer of $151,512—the supposed overpayment—in two separate wires of $53,011.70 and $98,450.30.  FONTANILLA directed these amounts to separate bank accounts that FONTANILLA controlled that were associated with two loan pools, "Pool 1" and "Pool 2".  According to Victim Company representatives, Pool 1 and Pool 2 were completely unrelated to the original third-party mortgage servicer's payment (and were in fact serviced by Company A).[3]

19.     On or about January 25, 2024, FONTANILLA caused a Pool 1 bank account to send $55,080.50, including the $53,011.70 wire representing a portion of the supposed

---

[3] FONTANILLA incurred a $50 fee for these two wires, which accounts for the $50 not split between the Pool 1 wire and the Pool 2 wire.

overpayment, from the Victim Company to Company A, even though the overpayment had not come from Company A. FONTANILLA falsely characterized the wire as a "Refund/Return of Unused Funds".

20.     On or about January 25, 2024, FONTANILLA also caused a Pool 2 bank account to wire approximately $109,000 to Company A, including $98,450.30 from the supposed overpayment from the third-party mortgage servicer. Even though the money had not come from Company A, FONTANILLA falsely described the payment as a "Refund/Return of Unused Funds".

21.     On or about January 26, 2024, at approximately 7:42 a.m., FONTANILLA emailed a Company A employee ("Employee 1") and requested that Employee 1 wire the $55,080 that FONTANILLA had wired to Company A the day before back to the Victim Company. In the email, FONTANILLA attached a screenshot reflecting the details of the January 25 wire falsely indicating that it was related to Pool 1.

22.     As shown below, FONTANILLA instructed Employee 1 to wire the funds to the attention of "Ricardo Fontanilla" at a personal bank account that FONTANILLA controlled at Wells Fargo Bank (with an account number ending in 5907). In the email, FONTANILLA did not disclose to Employee 1 that the Wells Fargo account was his personal bank account.



23.    On January 26, 2024, Company A completed the wire of $55,080.50 that FONTANILLA had requested to his Wells Fargo account.  The wire in large part represented a portion of the supposed overpayment from the third-party mortgage servicer to the Victim Company.

24.    On January 26, 2024, at approximately 7:45 a.m., FONTANILLA emailed Employee 1 and requested that Company A wire the $109,623.56 that the Victim Company had sent to Company A—in purported relation to Pool 2—back to the Victim Company.  In the email, FONTANILLA attached a screenshot of the wire he had caused the Victim Company to send to Company A in supposed relation to Pool 2.  FONTANILLA directed Employee 1 to wire the funds to FONTANILLA's personal account at Wells Fargo, again without disclosing that the account belonged to FONTANILLA and not Company A.

25.    On January 26, 2024, Company A completed the wire of $109,623.56 to FONTANILLA's Wells Fargo account.  The wire in large part represented a portion of the supposed overpayment from the third-party mortgage servicer to the Victim Company.

26.    In total, in January 2024, FONTANILLA caused Company A to wire approximately $164,074.06 to his personal bank account.

27.    I have reviewed Victim Company records, FONTANILLA bank records, and federal wire transfer records showing transactions that followed a similar pattern:  some kind of supposed overpayment by third-party servicers directed from Victim Company accounts to Company A, and payments from Company A accounts (as purported returns of overpayments) to FONTANILLA's personal bank account.  These transfers total $6,643,090.78 for the period between August 2016 and December 2025, as detailed in the table below.

| Year | Transfers--Company A to FONTANILLA Wells Fargo Account |
|---|---|
| 2016 | $29,517.98 |
| 2017 | $133,547.49 |
| 2018 | $238,012.45 |
| 2019 | $347,260.89 |
| 2020 | $523,045.73 |
| 2021 | $742,466.24 |
| 2022 | $1,235,565.27 |
| 2023 | $1,493,776.86 |
| 2024 | $977,903.45 |
| 2025 | $922,014.42 |
| **TOTAL** | **$6,643,090.78** |

28.     I have also reviewed Victim Company emails that FONTANILLA sent to Employee 1.  The emails, which contain wiring instructions like the one described in paragraph 22 above, coincide with approximately 209 wires that Company A sent to the Wells Fargo account that FONTANILLA controlled.

*FONTANILLA's Spending*

29. I have reviewed records for the account in FONTANILLA's name at Wells Fargo to which Company A directed more than $6.6 million in wires.

30.     The Wells Fargo records show significant spending between 2016 and 2025, including more than $3.2 million in credit card payments to Capital One, JPMorgan Chase, and American Express; $778,000 in mortgage and loan payments; more than $200,000 in cash and cash-equivalent withdrawals; spending of more than $70,000 at Cartier locations in Italy, Spain, the Philippines, and the United States; and an approximately $77,000 purchase from Toyota in 2023.  Based on my training and experience investigating financial frauds, this spending was inconsistent with the $83,000 annual salary FONTANILLA received from the Victim Company.

31.     There is accordingly probable cause to believe that, between at least as early as 2016 and 2025, RICARDO FONTANILLA, having devised and intending to devise a scheme to defraud and for obtaining money by means of false and fraudulent pretenses, representations, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate commerce, writing, signs, signals, pictures, and sounds for the purpose of executing such a scheme and artifice, to wit, wires from Company A bank accounts to FONTANILLA's Wells Fargo Bank account that passed through servers in New Jersey and Texas.

Sworn to under the pains and penalties of perjury,

*William Fath (by JDH)*
William Fath, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me telephonically pursuant to Rule 4.1(a) on April 30, 2026.

HON. JESSICA D. HEDGES
United States Magistrate Judge